**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SELENA RUCKER,**
o/b/o **J.V.R.,**

               **Plaintiff,**              **3:11-cv-877**
                                              **(GLS)**

               v.

**MICHAEL J. ASTRUE,**
Commissioner of Social Security,
               **Defendant.**
_____

**APPEARANCES:**                           **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Hinman, Howard Law Firm            LAURIE M. CEPARANO, ESQ.
P.O. Box 5250
80 Exchange Street
700 Security Mutual Building
Binghamton, NY 13902-5250

**FOR THE DEFENDANT:**
HON. RICHARD S. HARTUNIAN     KATRINA M. LEDERER
United States Attorney                Special Assistant U.S. Attorney
100 South Clinton Street
Syracuse, NY 13261

Steven P. Conte
Regional Chief Counsel
Social Security Administration
Office of General Counsel, Region II
26 Federal Plaza, Room 3904
New York, NY 10278

**Gary L. Sharpe**
**Chief Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiff Selena Rucker o/b/o J.V.R., challenges the Commissioner of Social Security's denial of Supplemental Security Income ("SSI"), seeking judicial review under 42 U.S.C. § 405(g). (*See* Compl., Dkt. No. 1.) After reviewing the administrative record and carefully considering the arguments, the court affirms the Commissioner's decision and dismisses the Complaint.

## II. Background

On October 25, 2008, Rucker protectively filed an application for SSI under the Social Security Act ("Act") on behalf of her daughter, who was then a minor, alleging disability since July 21, 1991. (*See* Tr.[1] at 87-89.) After the application was denied, Rucker requested a hearing before an Administrative Law Judge (ALJ), which was held on April 22, 2010. (*See id.* at 40-55, 57-63.) On May 13, 2010, the ALJ issued a decision denying the requested benefits, which became the Commissioner's final decision upon the Social Security Administration Appeals Council's denial of review. (*See id.* at 1-6, 19-39.)

---

[1] Page references preceded by "Tr." are to the Administrative Transcript. (*See* Dkt. No. 6.)

Rucker commenced the present action by filing a complaint on July 26, 2011, seeking review of the Commissioner's determination. (*See* Compl., Dkt. No. 1.) The Commissioner filed an answer and a certified copy of the administrative transcript. (*See* Dkt. Nos. 5, 6.) Each party, seeking judgment on the pleadings, filed a brief. (*See* Dkt. Nos. 8, 9.)

### III. **Contentions**

Rucker avers that the Commissioner's decision is not supported by substantial evidence and was arrived at through the application of incorrect legal standards. (*See* Dkt. No. 8 at 8-16.) Specifically, Rucker contends that the ALJ erred in: (1) deciding that J.V.R.'s impairments did not functionally equal a listed impairment; and (2) discounting the opinion of J.V.R.'s treating physician. (*See id.*) The Commissioner counters that the appropriate legal standards were used by the ALJ and his decision is supported by substantial evidence. (*See* Dkt. No. 9 at 8-19.)

### IV. **Facts**

The evidence in this case is undisputed and the court adopts the parties' factual recitations. (*See id.* at 1-8; Dkt. No. 8 at 4-7.)

### V. **Standard of Review**

The standard for reviewing the Commissioner's final decision under

42 U.S.C. § 405(g)[2] is well established and will not be repeated here. For a full discussion of the standard of review, the court refers the parties to its previous opinion in *Christiana v. Comm'r of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

## VI. Discussion

### A. Child Disability Determination

J.V.R., born July 21, 1991, was under the age of eighteen at the time of the application, but reached the age of eighteen before the date of the decision. (*See* Tr. at 87.) Therefore, the ALJ was required to determine whether J.V.R. was disabled under the meaning of the Act both before and after attaining the age of eighteen. *See* 20 C.F.R. § 416.924(f). For a full discussion of the three-step analysis used by the Social Security Administration to determine whether individuals under the age of 18 are disabled, the court refers the parties to its previous opinion in *Shatraw ex rel. K.C.Y., III, v. Astrue*, No. 7:11-cv-13, 2012 WL 589667, at *1 (N.D.N.Y. Feb. 22, 2012).

### B. Functional Equivalency

---

[2] 42 U.S.C. § 1383(c)(3) renders section 405(g) of Title 42 applicable to judicial review of SSI claims.

4

According to Rucker, the ALJ erred in finding that J.V.R. did not have a marked[3] limitation in any domain of functioning. (*See* Dkt. No. 8 at 10-16.) Specifically, Rucker argues that J.V.R. had marked limitations in acquiring and using information; interacting and relating with others; and health and physical well-being. (*See id.* at 13-16.) On the other hand, the Commissioner contends, and the court agrees, that the ALJ's functional equivalency analysis was supported by substantial evidence. (*See* Dkt. No. 9 at 15-19.)

   1.   *Acquiring and Using Information*

This domain contemplates a child's ability to "acquire or learn information, and how well [she] use[s] the information [she has] learned." 20 C.F.R. § 416.926a(g). Children in J.V.R.'s age range should "be able to use what [they] have learned in daily living situations without assistance (e.g., going to the store, using the library, and using public transportation)" and "comprehend and express both simple and complex ideas, using increasingly complex language." *Id.* § 416.926a(g)(2)(v). The ALJ found

---

[3] A "marked" limitation is one that "interferes seriously" with the claimant's "ability to independently initiate, sustain, or complete activities" within the given domain, while an "extreme" limitation "interferes very seriously" with those abilities. 20 C.F.R. § 416.926a(e)(2)(i), (3)(i).

that J.V.R. had less than a marked limitation in this domain, relying on the opinions of her school psychologist and special education academic advisor and her ability to participate in general education classes with some resource help.  (*See* Tr. at 27.)

Rucker argues primarily that the ALJ ignored certain of J.V.R.'s scores on intelligence testing and the fact that she was only able to attend general education classes due to the help of an aide  (*See* Dkt. No. 8 at 13-14.)  Indeed, J.V.R. underwent intelligence testing on several occasions with the results indicating that her cognitive abilities have gone down over the years.  (*See* Tr. at 296-98.)  Testing conducted by her school in 2001 indicated that her IQ was in the average range, while her scores in 2003 were in the low average range indicating weakness in reading, writing, and math.  (*See id.* at 296.)  Updated testing in 2006 indicated that J.V.R.'s IQ was in the borderline range with weaknesses in reading and writing, though her math scores had improved.  (*See id.*)  Testing conducted by psychologist Mary Ann Moore in December 2008 indicated that she was functioning in the mild mental retardation range.  (*See id.* at 217-18.)  Finally, on testing completed by J.V.R.'s school in 2009, her scores were in the extremely low and low average ranges.  (*See id.* at 297-98.)

6

Contrary to Rucker's claims, the ALJ considered all of J.V.R.'s test results but found her to have less than a marked limitation in this domain due to the opinion of school psychologist Andrea Roberts, who found that J.V.R. compensated for any cognitive weaknesses with hard work and determined that the classification of mental retardation did not fit her due to her higher adaptive and coping skills. (*See* Tr. at 301.) Based on reports from J.V.R's special education academic advisor, Jen Duong, Roberts opined that learning disabled best described J.V.R. (*See id.*) Indeed, Duong rated J.V.R. as falling within the average range in all adaptive areas on adaptive testing completed for her, and stated that she saw no areas of concern. (*See id.* at 299-300.) Roberts described J.V.R. as a "very capable student who should find success with the proper supports, as well as hard work and effort on her part." (*Id.* at 301.)

Accordingly, the ALJ's finding that J.V.R. suffered less than a marked limitation in her ability to acquire and use information is supported by substantial evidence.

*2. Interacting and Relating with Others*

This domain contemplates a claimant's ability to "initiate and sustain emotional connections with others, develop and use the language of [her]

community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). Citing, among other things, Rucker's statements on a function report that J.V.R. "had friends her own age, could make new friends, could generally get along with her mother or other adults, and could generally get along with school teachers," the ALJ found J.V.R.'s limitation in this domain to be less than marked. (Tr. at 29; *see id.* at 98.) Substantial evidence in the record supports this conclusion.

Rucker argues primarily that the ALJ failed to adequately consider the fact that J.V.R was bullied by her peers, at both school and a summer job, and claims that J.V.R had been hospitalized twice due to negative social interaction with her peers. (*See* Dkt. No. 8 at 14-15.) In fact, the ALJ noted that J.V.R. complained of being picked on by other students at school and was evaluated through the Comprehensive Psychiatric Emergency Program (CPEP) for depression due to being picked on by kids at school. (*See* Tr. at 29.) However, psychological reports completed by J.V.R.'s school in 2006 and 2009 noted that her teachers described her as a well-behaved, hardworking student with a positive attitude, who advocates for herself. (*See id.* at 155, 295-96.) Further, Individual

8

Education Programs (IEPs) completed in April 2008 and February 2009 described J.V.R. as "a very friendly young girl who is very respectful to adults and peers[,] is very compassionate towards others[,] seems to think highly of herself[,] and presents herself well to her peers." (*Id.* at 167, 182.) The IEPs also indicated that J.V.R. is able to work well with others most of the time and interact appropriately in social situations, and had developed positive relationships with her teachers and many classmates. (*See id.*)

In addition, in December 2008, Moore reported that J.V.R.'s manner of relating socially is adequate, although she is slightly withdrawn and shy. (*See id.* at 211.) J.V.R. expressed to Moore that she had friends and did not have difficulties in getting along with others, although Moore opined that she may have such difficulties. (*See id.* at 209, 212, 219.) Finally, J.V.R. met with social worker Janelle Smith in April and May 2009 and expressed frustration over restrictions on her social activities by her mother. (*See id.* at 262-71, 276-77.) Specifically, J.V.R. wanted a later curfew and to be allowed to see her boyfriend. (*See id.*)

Accordingly, the ALJ's finding that J.V.R. suffered less than marked limitation in her ability to interact and relate with others is supported by substantial evidence.

9

### 3. *Health and Physical Well-being*

In this domain, the ALJ considers "the cumulative physical effects of physical or mental impairments and their associated treatments or therapies " on a child's functioning that were not previously considered in the domain evaluating the child's ability to move about and manipulate objects. 20 C.F.R. § 416.926a(*l*). Examples of limitations in this domain include: "generalized symptoms, such as weakness, dizziness, agitation . . . lethargy, . . . , or psychomotor retardation[;] somatic complaints related to [the child's] impairments[;] limitations in [the child's] physical functioning because of [her] treatment[; and] exacerbations from one impairment or a combination of impairments that interfere with [the child's] physical functioning." 20 C.F.R. § 416.926a(*l*)(4)(i)-(iv). In addition, the ALJ may also determine that the child has a "marked" limitation if the child is "frequently ill because of [her] impairment(s) or [has] frequent[4]

---

[4] For purposes of this domain, "frequent" means that the child experiences "episodes of illness or exacerbations that occur on an average of [three] times a year, or once every [four] months, each lasting [two] weeks or more" or "episodes that occur more often than [three] times in a year or once every [four] months but do not last for [two] weeks, or occur less often than an average of [three] times a year or once every [four] months but last longer than [two] weeks, if the overall effect (based on the length of the episode(s) or its frequency) is equivalent in severity." 20 C.F.R. § 416.926a(e)(2)(iv).

exacerbations of [her] impairment(s) that result in significant, documented symptoms or signs." *Id.* § 416.926a(e)(2)(iv).

Here, in making his determination with respect to this domain, the ALJ noted that J.V.R. had never been psychiatrically hospitalized and was not on any psychiatric medication at the time of her consultative exam with Moore. (*See* Tr. at 31.) Rucker contends that ALJ erred in determining that J.V.R. had never been psychiatrically hospitalized and, further, J.V.R.'s hospitalization for an overdose on her medication along with her failure to remain compliant in taking certain medications evinces her marked limitation in this domain. (*See* Dkt. No. 8 at 15.) While the ALJ could undoubtedly have articulated his reasoning more thoroughly, his finding of less than marked limitation in this domain is nevertheless supported by substantial evidence.

In April 2008, Dr. Timothy Roche diagnosed J.V.R. with depressive disorder, NEC and prescribed her medication. (*See* Tr. at 258-259.) Thereafter, both Rucker and J.V.R reported that she was improving. (*See id.* at 256.) By the time J.V.R. met with Moore in December 2008, she stated that she was no longer taking the anti-depressant. (*See id.* at 209.) In March 2009, J.V.R. was again examined by Roche who prescribed a

11

new medication. (*See id.* at 279-80.) Less than a week later, J.V.R. was evaluated through the CPEP in the Binghamton General Hospital Emergency Department for complaints of depression. (*See id.* at 231-44.) She had thoughts of harming herself, but had never tried to harm herself or others. (*See id.* at 233, 240.) At that time J.V.R. reported that she had never been psychiatrically hospitalized. (*See id.* at 241.) J.V.R. was discharged the same day and, thereafter, sought counseling from Smith regarding attaining more independence from her family. (*See id.* at 231, 244, 262-71, 274-77.) Smith assessed J.V.R.'s Global Assessment of Functioning (GAF) at sixty-five[5] which signifies some mild symptoms or some difficulty in social, occupational, or school functioning. (*See id.* at 262-71, 274-77.) In a follow up visit with Dr. Roche, he reported that J.V.R. was not anxious or depressed and had no suicidal ideation or paranoia and assessed that her depression was improved. (*See id.* at 272-73.) Indeed,

---

[5] The GAF Scale "ranks psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *Pollard v. Halter*, 377 F.3d 183, 186 n.1 (2d Cir. 2004). A GAF of between sixty-one and seventy indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., Text Rev. 2000).

J.V.R. stated that her medicine was helping. (*See id.*)

Finally, beginning in August 2009, J.V.R. sought treatment from Dr. Suresh Undavia. (*See* Tr. at 313-16, 322.) Dr. Undavia diagnosed J.V.R. with schisoaffective disorder and personal disorder, schizoidal and assessed her GAF at fifty-five,[6] indicating moderate symptoms. (*See id.* at 313-14.) Dr. Undavia also prescribed J.V.R. additional medication which he noted she was reluctant to take. (*See id.*) In March 2010, J.V.R. reported to Dr. Undavia that she had been treated at a crisis center due to an overdose on the medications he had prescribed because she "was so upset during [her] menstrual period." (*Id.* at 322.)

Notably, medical and IEP reports, as well as Rucker's own statements, find J.V.R to be physically normal. (*See* Tr. at 97, 167, 182, 206-07, 234-35, 251-54.) Moreover, Rucker noted that J.V.R.'s daily activities were not limited by her impairments. (*See id.* at 96.) Indeed, J.V.R.'s mental impairments did not prevent her from attending church or school or participating in activities she enjoyed such as choir, dancing, and

---

[6] A GAF of between fifty-one and sixty indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." Diagnostic and Statistical Manual of Mental Disorders at 34.

skating. (*See id.* at 203, 212.) Finally, J.V.R's apparent hospitalization due to an overdose on medication took place after she attained age eighteen and, as such, is not considered in determining whether the frequency requirement for the domain of physical health and well being was met. (*See id.* at 45, 322); 20 C.F.R. § 416.926a(e)(2)(iv).

Accordingly, the ALJ's finding that J.V.R. suffered less than a marked limitation in the domain of health and physical well-being is supported by substantial evidence.

## C. <u>Treating Physician Rule</u>

Rucker also contends that the ALJ erred by declining to give controlling weight to the opinion of treating physician Dr. Undavia. (*See* Dkt. No. 8 at 8-9.) According to Rucker, the ALJ erred in relying upon the opinion of a non-examining social security review physician rather than Dr. Undavia. (*See id.* at 8-9.) The Commissioner counters, and the court agrees, that the ALJ's decision to give Dr. Undavia's opinion little weight is supported by substantial evidence. (*See* Dkt. No. 9 at 12-15.)

Medical opinions, regardless of the source, are evaluated by considering several factors outlined in 20 C.F.R. § 416.927(c). Controlling weight will be given to a treating physician's opinion that is "well-supported

14

by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Id.* § 416.927(c)(2); *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). Unless controlling weight is given to a treating source's opinion, the ALJ is required to consider the following factors in determining the weight assigned to a medical opinion: whether or not the source examined the claimant; the existence, length and nature of a treatment relationship; the frequency of examination; evidentiary support offered; consistency with the record as a whole; and specialization of the examiner. *See id.* § 416.927(c).

Here, Dr. Undavia submitted an opinion which found that J.V.R. had a seriously limited ability to understand, remember, and carry out complex or detailed, but not complex, job instructions. (*See* Tr. at 320.) He also opined that J.V.R had a seriously limited ability to relate predictably in social settings and rated her ability to behave in an emotionally stable manner as poor or none. (*See id.* at 321.) According to Dr. Undavia, J.V.R. has a good ability to maintain her personal appearance, a fair ability to follow work rules, relate to co-workers, deal with the public, and interact with supervisors, and a fair to seriously limited ability to use judgment. (*See id.* at 319, 321.) In addition, J.V.R. has a fair ability to understand,

remember, and carry out simple job instructions, deal with work stress, function independently, and maintain attention and concentration. (*See id.* at 320.) On the other hand, state agency review psychiatrist, Dr. K. Prowda opined that J.V.R. had no limitations in her ability to interact and relate with others. (*See id.* at 223.)

The ALJ explained that, because Dr. Undavia's treating relationship with J.V.R. was only brief and sporadic, he accorded it little weight. (*See* Tr. at 33.) On the other hand, he gave significant weight to the opinion of Dr. Prowda, because it was supported by the evidence of record, including J.V.R.'s medical history. (*See id.* at 26, 34.)

As the court has already found, substantial evidence supports the ALJ's determination with respect to J.V.R.'s functional equivalency under the child disability standard, including the determination that J.V.R. did not suffer from marked limitations in the domain of interacting and relating with others. *See supra* Part VI. B. In addition, under the adult disability standard, the ALJ determined that J.V.R. had the residual functional capacity (RFC) to perform unskilled work, including the ability to "understand, carry out and remember simple instructions, to respond appropriately to supervision, coworkers, and unusual work situations; and

to deal with changes in a routine work setting."⁷ (Tr. at 32.) This is consistent with Dr. Undavia's opinion that J.V.R. had a fair ability to understand, remember, and carry out simple job instructions. (*See id.* at 320.) Moreover, Dr. Undavia's opinion regarding J.V.R.'s ability to make personal-social adjustments is inconsistent with other substantial evidence in the record and, thus, was properly not given controlling weight by the ALJ. *See Halloran*, 362 F.3d at 32. Specifically, at the time of the hearing, J.V.R. was in the twelfth grade, attending general education classes with resource help, on track to earn a diploma, and seeking help from a job coach to obtain employment after graduation. (*See* Tr. at 44-45, 180-81.) Indeed, J.V.R.'s IEPs indicate that she had no behavioral problems at school, but rather, is able to interact appropriately in social situations and work well with others most of the time. (*See id.* at 167, 182.) Further, treatment notes in the record demonstrate that her depression improved with medication. (*See id.* at 256, 272-73, 304.)

Because the ALJ considered the relevant factors and properly

---

⁷ A claimant's RFC "is the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). In assessing a claimant's RFC, an ALJ must consider "all of the relevant medical and other evidence," including a claimant's subjective complaints of pain. Id. § 416.945(a)(3).

17

explained his reasoning for discounting the weight given to Dr.Undavia's opinion, his decision to do so was both legally sufficient and supported by substantial evidence.

## D.     Remaining Findings and Conclusions

After careful review of the record, the court affirms the remainder of the ALJ's decision as it is supported by substantial evidence.

## VII.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **AFFIRMED** and Rucker's Complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case and provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

November 21, 2012
Albany, New York

*Gary L. Sharpe*
Gary L. Sharpe
Chief Judge
U.S. District Court